UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| HAROLD R. BELL, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 3:10cv8 (MRK) |
| | : | |
| NORBERTO LUNA, | : | |
| TIMOTHY SILVAS, | : | |
| CAROL CHAPDELAINE, | : | |
| JAMES VADNAIS, | : | |
| COLIN WILSON, and | : | |
| PETER MURPHY, | : | |
| | : | |
| Defendants. | : | |

## RULING AND ORDER

Plaintiff Harold R. Bell claims that officials at the MacDougall-Walker Correctional Institution subjected him to unconstitutional conditions of confinement and showed deliberate indifference to his serious medical needs, in violation of the Eighth Amendment's prohibition on cruel and unusual punishment. Mr. Bell's claims, brought under 42 U.S.C. § 1983, stem from a nearly seven-month period from June 2008 to January 2009 in which his prison mattress was, in his description, "defective," "unhygienic," and "grossly inadequate." Compl. [doc. #2] ¶ 1. The condition of the mattress resulted in pains and ailments which, Mr. Bell alleges, were inadequately treated by a prison doctor, Defendant Timothy Silvas.

Dr. Silvas and his co-defendants—Peter Murphy, the Warden; Carol Chapdelaine, the Deputy Warden of Administrative Services; James Vadnais, Inmate Remedies Coordinator; Colin Wilson, Unit Counselor; and Norberto Luna, the Unit Manager and Correctional Captain—have responded with the currently-pending Motion to Dismiss [doc. # 22]. They

claim that Mr. Bell's allegations do not rise to the level of cruel and unusual punishment, that none of the Defendants had enough personal involvement to be liable for damages under 42 U.S.C. § 1983, and that they should in any case be granted qualified immunity, as Mr. Bell's allegedly infringed rights were not ones clearly established at the time the actions took place.

The Court disagrees, at least in part. Whether or not the factual record, when developed more fully, will ultimately show that the Eighth Amendment was violated, the factual allegations in Mr. Bell's Complaint must be taken as true at this stage, and they plausibly describe an unconstitutional condition of confinement. Further, the need to provide an inmate with a hygienic mattress was clearly established at the time of the alleged deprivation; qualified immunity is therefore inappropriate. On the other hand, Mr. Bell's pleadings fail to establish sufficient personal involvement in this situation by four of the named defendants: Mr. Murphy, Ms. Chapdelaine, Mr. Vadnais, and Mr. Wilson. Nor do Mr. Bell's pleadings suggest that he received constitutionally deficient medical care from Dr. Silvas. For the reasons that follow, Mr. Bell's claims are dismissed as to those five defendants. The Court will allow Mr. Bell's claim against Mr. Luna to proceed and will await a further development of the factual record regarding the violations Mr. Bell has alleged.

I.

The function of a motion to dismiss under Rule 12(b)(6) is to determine whether the plaintiff has stated a legally-cognizable claim that, if proven, would entitle him to relief. In making that determination, the Court accepts as true all factual allegations in the complaint and draws all reasonable inferences from those allegations in the light most favorable to the plaintiff. *See Harris v. Mills*, 572 F.3d 66, 71-72 (2d Cir. 2009). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim

to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 95 (2d Cir. 2009). When filed by a *pro se* plaintiff, a complaint is to be "liberally construed" and "held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Harris*, 572 F.3d at 72.

  The factual allegations stated by Mr. Bell in his Complaint are as follows. On or about June 26, 2008, Mr. Bell submitted a detailed request to Unit Manager Luna, pursuant to institutional policies, complaining that his mattress:

> had been slashed into and 'slit' down its center the full length of the mattress exposing it's [sic] internal insulation materials, of which a substantial amount had been missing, rendering the mattress intolerable, and uselessly defective, unhygienic, and substantially shortened with an odorous smell of mildew which contributed to the other defective conditions . . . .

Compl. [doc. # 2] ¶ 2. After he followed up with Mr. Luna in person on July 14, Mr. Bell was told that his request for a new mattress had been forwarded to Deputy Warden Chapdelaine. Mr. Bell submitted an additional, detailed complaint to Ms. Chapdelaine on August 4, claiming that his defective and unsanitary mattress was causing him "substantial pain and a loss of restful sleep." *Id.* ¶ 5. Two days later, Ms. Chapdelaine denied Mr. Bell's request for a new mattress, informing him that the Unit Manager, not she, handled mattress exchanges. On August 10, Mr. Bell again petitioned Mr. Luna for a new mattress but received no reply. On August 18, Mr. Bell had another conversation with Mr. Luna about whether he could get an adequate mattress, and Mr. Luna told him: "I don't have mattresses like that." *Id.* ¶ 9.

  Mr. Bell claims that he suffers from several chronic ailments, some of which were exacerbated by the condition of his mattress. Mr. Bell's degenerative glaucoma was aggravated, causing him eye pain, severe tension headaches, and a risk of elevated intraocular

pressure; he experienced pain, stiffness, and reduced mobility in his joints, limbs, lower back, hips, knees, and right elbow; he has asthma, and worried that the exposed mattress insulation would make it worse; and he suffers from a variety of mental health illnesses, including depression and Intermittent Explosive Disorder, which were worsened by the sleeplessness caused by his defective mattress. Mr. Bell submitted requests to the medical unit on August 19 and 26, and on August 24, 25, and 28 he spoke to staff members in the medical unit about getting his mattress replaced. A nurse told Mr. Bell that mattresses were a custody, rather than medical, issue.

On August 29, Mr. Bell submitted a grievance which was marked as received on September 10, and to which Warden Murphy responded on September 23. *See* Compl. [doc. # 2] Ex. 79. In his response, Mr. Murphy wrote that "it has been confirmed that this mattress seems to meet conditions for replacement." *Id.* Ex. 80. Mr. Murphy instructed Mr. Bell to present the disposition of his grievance to his unit staff, though it is unclear whether Mr. Bell immediately did so. Mr. Bell claims that no corrective measures were taken in response to his grievance.

Mr. Bell met with Dr. Silvas on September 22 to discuss his joint pain; Dr. Silvas examined him, ordered x-rays and blood tests, and prescribed an increased dosage of motrin. After submitting further requests to the medical unit, Mr. Bell met with a mental health staff member on October 19. He made further requests in November and December for diagnoses of his aches, as well as for an MRI. His X-rays showed no fractures or dislocations. *See id.* Ex. 65.

On October 27, Warden Murphy and members of his administrative staff inspected Mr. Bell's unit for violations. Mr. Bell again spoke with Mr. Luna about replacing his mattress

4

and was told to "write a request and if you get it, you get it." *Id.* ¶ 33; *see also id.* Ex. 67 (Almeida Aff.). On December 1, Mr. Bell filed further requests with two other Defendants, Mr. Vadnais and Mr. Wilson. Mr. Wilson did not respond. Mr. Vadnais wrote to Mr. Bell the following day to say that the unit staff should handle his request and that Mr. Bell could contact him again if that did not happen. *See id.* Ex. 58. When Mr. Bell wrote to a property officer on December 29, he received another response instructing him to go through his unit manager (Mr. Luna), which Mr. Bell did yet again. Mr. Bell reports that he saw mattresses in better condition than his own stacked against a wall in the prison, going unused.

A lockdown occurred on January 14, 2009, during which inmates had to place their mattresses outside their cells. Upon completion of the lock down, Mr. Bell was told that he had been given a new mattress.

On January 23, 2009, Mr. Bell filed a new grievance, complaining of the seven months he had gone without an adequate mattress. The Administrative Remedy Form was returned with a request that his grievance be "stated simply and coherently." *Id.* Ex. 35. On February 6, Mr. Bell filed a revised grievance stating that his replaced mattress was not thick enough to support his hip joints. *See id.* Ex. 30. Ms. Chapdelaine responded on March 4, denying Mr. Bell's request and informing him that a thicker mattress would only be provided based on documented medical need. She also noted that Mr. Bell's previous complaints had centered on the rip in his mattress, not its thickness, and that "[a]lthough it did take much time, [his] mattress was eventually replaced." *See id.* After unsuccessfully appealing and exhausting his administrative remedies, Mr. Bell on March 15 filed another Inmate Request Form with Warden Murphy, describing all that had happened regarding his mattress. The

form was returned on March 27 with a note, written by Mr. Luna rather than Mr. Murphy, observing merely that Mr. Bell had been issued a new mattress. *See id.* Ex. 24.

Meanwhile, in January and February 2009, Mr. Bell had written to Dr. Silvas requesting analgesic cream. Dr. Silvas did not respond. In September 2009, Mr. Bell asked to be seen by the medical unit for lower back pain, which he claimed had been caused by Defendants' slow response in replacing his inadequate mattress.

**II.**

As the briefing [docs. # 22, 26] on the pending Motion to Dismiss makes clear, the Parties disagree on three questions:

(1)  whether Dr. Silvas showed deliberate indifference to Mr. Bell's serious medical needs;

(2)  whether the failure to replace Mr. Bell's mattress created an unconstitutional condition of confinement, and if so, whether any of the named defendants had sufficient personal involvement in the violation to warrant liability for damages; and

(3)  whether the defendants are entitled to qualified immunity.

The Court will take these questions in order in this Part and the two that follow.

The first of these questions is the easiest to decide. "Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation." *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003). "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise

6

to an Eighth Amendment violation. Moreover, negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) (internal citations omitted). Deliberate indifference claims involve both objective and subjective components: the harm must be objectively serious, *see Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (requiring "a condition of urgency, one that may produce death, degeneration, or extreme pain"), and the defendants must have actually known of and disregarded the risk to the inmate, *see id.* (equating the requisite state of mind to that of criminal recklessness).

Mr. Bell has alleged that Dr. Silvas did not take sufficient measures to treat his joint and back pain; more specifically, he alleges that Dr. Silvas failed to prescribe him with analgesic cream. *See* Compl. [doc. # 2] ¶¶ 60-62, 65-66. This is a disagreement over proper treatment, not a violation of the Eighth Amendment. Dr. Silvas increased Mr. Bell's dosage of another form of pain medication after he examined Mr. Bell in September 2008. *See id. ¶ 25.* Dr. Silvas also referred Mr. Bell for x-rays and blood work to determine whether he suffered from arthritis. The extensive medical records Mr. Bell has submitted documenting Dr. Silvas's ongoing responsiveness to Mr. Bell's many serious health concerns undercuts Mr. Bell's claim that Dr. Silvas was deliberately indifferent to his health. *See* Exs. 7-23.

For these reasons, Defendants' Motion to Dismiss is therefore GRANTED as to Dr. Silvas.

### III.

Mr. Bell's claim against the remaining Defendants is that by failing to replace Mr. Bell's inadequate and unhygienic mattress for nearly seven months, the Defendants created an condition of confinement that violated the Eighth Amendment. "[T]he Constitution does not

mandate comfortable prisons," *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981), but prisoners may not be denied "the minimal civilized measure of life's necessities," *id.* at 347. Nor may prison officials expose prisoners to conditions that "pose an unreasonable risk of serious damage to [their] future health." *Helling v. McKinney*, 509 U.S. 25, 35 (1993). The Eighth Amendment imposes duties on prison officials to "provide humane conditions of confinement" and "ensure that inmates receive adequate food, clothing, shelter, and medical care." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

To show an unconstitutional condition of confinement, a prisoner must "prove[] both an objective element—that the prison officials' transgression was 'sufficiently serious'—and a subjective element—that the officials acted, or omitted to act, with a 'sufficiently culpable state of mind,' *i.e.,* with 'deliberate indifference to inmate health or safety.'" *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (quoting *Farmer*, 511 U.S. at 834). The Defendants argue that Mr. Bell's allegations do not establish either of these elements.

A.

Few bright lines guide courts when they are called on to decide whether a given form of treatment is, objectively, serious enough to implicate the Eighth Amendment. In part, this is because the meaning of the Constitution's proscription of the "cruel and unusual" is not "static," but rather "draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society." *Rhodes*, 452 U.S. at 346. The ambiguity is compounded, however, because alleged Eighth Amendment violations tend to vary not only in their severity, but also in their duration. A deprivation that might not be unconstitutional if it lasted for two days could easily violate the constitution after it persisted for half a year, and while

8

the Constitution does not call for pillowtop mattresses in prisons, neither does it allow for no mattress at all.

The Defendants take a curious approach in arguing that Mr. Bell's complaints are not serious enough to constitute cruel and unusual punishment. Rather than providing cases in which deprivations greater than Mr. Bell's were found constitutional, Defendants have offered the Court a number of cases in which greater deprivations were found *unconstitutional*. As such, Defendants cite to *Wheeler v. Walker*, 303 F. App'x 365 (7th Cir. 2008), in which the plaintiff complained of a roach-infested, trash-strewn cell, a thin blanket in cold temperatures, and a toilet that malfunctioned and was encrusted with urine and waste—complaints the Seventh Circuit found stated a claim under the Eighth Amendment. Defendants cite as well to *Rhodes*, where Justice Brennan's concurring opinion discusses examples in which prison overcrowding led to inmates' being forced unconstitutionally to sleep on mattresses spread on floors next to urinals. *See Rhodes*, 452 U.S. at 355 (Brennan, J., concurring) (citing *Pugh v. Locke*, 406 F. Supp. 318, 323 (M.D. Ala. 1976)). From these examples, Defendants conclude that since Mr. Bell "did not allege that his mattress was infested with roaches or vermin," "had urine or waste on it," or "was located on the floor or near a urinal," but rather "*only* alleged that his mattress was slit down the middle and smelled of mildew," Defs.' Mem. of Law [doc. # 22-1] at 10 (emphasis in original), Mr. Bell has not alleged a constitutional violation.

This hardly follows. For one thing, roaches and urine, while disturbing both for sanitary and dignitary reasons, are not necessary conditions for Eighth Amendment claims. For another, to say that Mr. Bell was treated better than the inmates in *Wheeler* or *Pugh* is not

9

to say that he was treated constitutionally. The fact that it is unconstitutional to treat a prisoner horribly does not imply that it is permissible to treat him just badly.[1]

The Court disagrees as well with Defendants' characterization of Mr. Bell's allegations. It is not the case that he has alleged "*only* that his mattress was slit down the middle and smelled of mildew." *Id*. (emphasis in original). In fact, Mr. Bell has alleged that his mattress was slit down its entire length, that the internal insulation was exposed and a "substantial amount" had gone missing, and that this, in combination with "an odorous smell of mildew," made the mattress useless and unhygienic. *See* Compl. [doc. # 2] ¶ 2. Worse, these conditions were allowed to continue for nearly seven months. This last point bears repeating because it distinguishes Mr. Bell's case from many of those cited by the Defendants. For example, while the conditions in *Wheeler* may well have been worse than those suffered by Mr. Bell, they lasted only two weeks. *See Wheeler*, 303 F. App'x at 367; *see also Murphy v. Walker*, 51 F.3d 714, 720-21 (7th Cir. 1995) (complaint alleging that a prisoner who spent a week and a half in his cell without adequate heat, clothing, or bedding stated an Eighth Amendment claim).[2] In determining the objective seriousness of an alleged deprivation, the Court must consider its duration, not merely its intensity.

---

[1] Defendants also argue, equally unconvincingly, in the reverse direction, citing two district court cases in which prisoners forced to sleep on (presumably adequate) mattresses placed on the floor were found *not* to have stated a sufficiently serious claim under the Eighth Amendment. Defs.' Mem of Law [doc. # 22-1] at 10-11. The constitutionality of a lesser deprivation does not, of course, show that some greater deprivation will also be constitutional.
[2] The same difficulty—basically, that of comparing apples to oranges—arises also from Defendants' reading of *Trammell v. Keane*, 338 F.3d 155 (2d Cir. 2003), a precedential Second Circuit opinion involving a prisoner deprived of a mattress and bedding for two weeks, of clothing and toiletries for seventeen days, and of adequate toilet paper for one week. Defendants have misread that case, however: the Second Circuit found it "unnecessary to consider whether the conditions of confinement to which Trammell was subjected were sufficiently serious to satisfy the first prong of the *Farmer* analysis." *Compare Trammell*, 338 F.3d at 162, *with* Defs.' Mem. of Law [doc. # 22-1] at 10.

The Seventh Circuit has said that "a lack of sanitary conditions, including clean bedding, may qualify as a denial of the minimal civilized measure of life's necessities." *Townsend v. Fuchs*, 522 F.3d 765, 774 (7th Cir. 2008) (quotation marks omitted) (finding sound the parties' shared assumption that having a "wet, moldy, foul smelling mattress" for fifty-nine days was sufficiently serious to implicate the Eighth Amendment). The Tenth Circuit has held that "a state must provide within such living space reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities (i.e., hot and cold water, light, heat, plumbing). In short, a state must provide an inmate with shelter which does not cause his degeneration or threaten his mental and physical well being." *Ramos v. Lamm*, 639 F.2d 559, 568 (10th Cir. 1980). The Eighth Circuit has found that a deprivation of adequate clothing and bedding bearing "no relationship whatever to any security measure" amounts to "an unnecessary infliction of pain." *Maxwell v. Mason*, 668 F.2d 361, 363 (8th Cir. 1981). *Maxwell* involved a prisoner held in isolation for two weeks, permitted only underwear and a mattress during that time. *Id*.

Importantly, the Second Circuit has cited the Eighth Circuit's opinion in *Maxwell* for precisely the proposition noted above: that a deprivation of bedding that is unnecessary from a security standpoint is unconstitutional. *See Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995). Defendants have also directed the Court's attention to an unpublished Second Circuit case, *Campbell v. Meachum*, 1996 U.S. App. LEXIS 29456 (2d Cir. 1996) (summary order), which, they claim, holds that "a urine stained mattress can violate the prohibition of cruel and unusual punishment." Defs.' Mem. of Law [22-1] at 10. Defendants go on to argue that, unlike urine-stained mattresses, torn mattresses that smell of mildew have not been held to violate the Eighth Amendment.

11

Defendants' reading of *Campbell* is surely too narrow. In *Campbell*, the Second Circuit, reinstating Campbell's Eighth Amendment claim, pointed out the condition of Campbell's urine-stained mattress—a condition which, significantly, lasted just fifteen days. As the Second Circuit observed in its Summary Order, "The failure to provide an inmate with a sanitary mattress and adequate toiletry articles has been found to violate both the Eighth and Fourteenth Amendments." *Id.* at *11. There is no indication in this language that the Second Circuit meant to limit its observation to urine-stained mattresses as opposed to those that are unsanitary in any other way. Certainly the cases which the Second Circuit cited in support of its claim were not so limited. *See Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992); *Dawson v. Kendrick*, 527 F. Supp. 1252, 1288-89 (S.D. W. Va. 1981).

Given courts' frequent inclusion of adequate and sanitary mattresses as part of the "minimal civilized measure of life's necessities," *Rhodes*, 452 U.S. at 349, this Court is unwilling to say as a matter of law that it is not cruel and unusual punishment for prison officials to allow an inmate to go nearly seven months with a torn, unstuffed, unhygienic mattress. *Cf. Gaston v. Coughlin*, 249 F.3d 156, 166 (2d Cir. 2001) ("We are unwilling to adopt as a matter of law the principle that it is not cruel and unusual punishment for prison officials knowingly to allow an area to remain filled with sewage and excrement for days on end."). Taking the facts alleged by Mr. Bell as true, and drawing reasonable assumptions in his favor, the Court finds that he has alleged a condition of confinement sufficiently serious to implicate the Eighth Amendment.

B.

However, as Judge Posner has written, "there is more to a subhuman-conditions case than subhuman conditions." *Jackson*, 955 F.2d at 22. There remains the subjective element

that must be shown before a violation of the Eighth Amendment is established. In *Farmer v. Brennan*, the Supreme Court held that

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer,* 511 U.S. at 837. The Supreme Court equated this standard with that of "recklessness" in criminal law. *See id.* at 839-40. It is not enough that the prison official should have known of the risk to the prisoner; he or she must have been actually aware of it. *See Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009).

In order to plead the subjective element sufficiently, however, a plaintiff need only allege in his complaint that a defendant had knowledge of the risks faced by the plaintiff; such knowledge "may be alleged generally" according to Rule 9 of the *Federal Rules of Civil Procedure*. *See Phelps*, 308 F.3d at 186. With this in mind, the Court will consider Mr. Bell's allegations as to each of the remaining Defendants.

*Unit Manager Luna*.  Mr. Bell alleges that he first informed Mr. Luna in writing on June 27, 2008 that his mattress was defective, inadequate, and unhygienic. Mr. Bell spoke with Mr. Luna about the mattress on or around July 14. Mr. Bell submitted a second written request for a new mattress to Mr. Luna on August 10. He spoke with Mr. Luna again on August 18 while Mr. Luna was conducting a tour of the unit. Mr. Bell spoke with Mr. Luna again during another unit inspection on October 27. Mr. Bell filed an additional written request with Mr. Luna on December 29. There he noted his several previous attempts to obtain a new mattress "via requests, grievance and even verbally mentioning it to you at different times." Ex. 52. Mr. Bell also noted that he had previously "made [Luna] aware of the

poor and unsanitary condition of [his] mattress which adversely affects [his] health condition." *Id.* In the midst of these many requests, the Warden had upheld Mr. Bell's grievance and "confirmed that [his] mattress seems to meet conditions for replacement." Ex. 80. Mr. Bell reports having seen mattresses in better condition that were not being used. Thus, in his Complaint, Mr. Bell alleges that Mr. Luna "willfully, wantonly, and maliciously disregarded plaintiff's request(s)." Compl. [doc. # 2] ¶ 44.

Given these repeated contacts, both verbal and written, between Messrs. Bell and Luna, as well as the fact that at least two of those contacts occurred during inspections of Mr. Bell's unit, Mr. Luna's subjective knowledge of the condition of Mr. Bell's mattress has been alleged in abundance. If Mr. Bell's mattress was in the unhealthful condition that he has alleged—and the Court, of course, must at this stage assume that it was—then Mr. Luna could not have failed to know the risk it posed to Mr. Bell, especially after it continued for nearly seven months.

The Court therefore finds that Mr. Bell has alleged a plausible claim against Defendant Luna. As to him, the Motion to Dismiss is DENIED.

*Carol Chapdelaine*. Mr. Bell wrote to Deputy Warden Chapdelaine on August 4, 2008 to request a replacement mattress. She responded two days later, denying Mr. Bell's request and informing him that she did not "handle/oversee mattress exchange" and that Mr. Bell's unit manager was responsible for that. Ex. 2. Mr. Bell's other contact with Ms. Chapdelaine occurred after Mr. Bell's mattress had been replaced. In response to his request for a thicker mattress, Ms. Chapdelaine noted that Mr. Bell had shifted claims: where before he had complained about a substandard mattress, he now was seeking a mattress thicker than those

standardly issued. *See* Ex. 30. Mr. Bell's request would only be granted, she wrote, if he had a documented medical need for a thicker mattress.

It is well settled law in this Circuit that supervisors who receive grievances from prisoners do not thereby become personally involved in the constitutional injuries inflicted by their subordinates. *See, e.g.*, *Mateo v. Fisher*, 682 F. Supp. 2d 423, 430-31 (S.D.N.Y. 2010) (collecting cases). This is the case even when the supervisor ignores a grievance entirely or forwards it on to someone else. *See id*. Ms. Chapdelaine did not ignore Mr. Bell's requests. Instead, she promptly responded to Mr. Bell's complaints and, in both cases, referred him to the officials (Mr. Luna and the medical staff) who could best help Mr. Bell obtain the relief he sought. Because personal involvement in a constitutional violation is a prerequisite to a § 1983 claim, *see Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994), Mr. Bell has not alleged a plausible claim against Deputy Warden Chapdelaine. As to her, the Motion to Dismiss is GRANTED.

*Peter Murphy*. Much the same argument applies to the Warden, Peter Murphy. Mr. Murphy granted Mr. Bell's request for a new mattress in September 2008. The only other alleged personal involvement on Mr. Murphy's part was a tour of Mr. Bell's unit in October 2008. On that tour, however, Mr. Bell says that he discussed the condition of his mattress with Mr. Luna, not Warden Murphy. Thus, Mr. Bell has not plausibly alleged that Warden Murphy was aware that his approval of a new mattress for Mr. Bell was not being carried out by subordinates. To the extent that Warden Murphy had any personal involvement in these matters at all, it was to help Mr. Bell, not to inflict a constitutional injury. The Motion to Dismiss is therefore GRANTED as to Mr. Murphy.

15

*James Vadnais*. Mr. Bell's allegations against Mr. Vadnais are sparse. Mr. Bell claims that he submitted a grievance to Mr. Vadnais on August 29, 2008, and that he permitted time to lapse before investigating the complaint. However, the exhibits Mr. Bell references show that his grievance was upheld by Mr. Murphy in September 2008. *See* Exs. 80-81. Then, in response to another grievance filed in December 2008, Mr. Vadnais told Mr. Bell that the unit staff should handle his request. Mr. Vadnais also told Mr. Bell to contact him if "staff does not or has not helped you." Ex. 58. Mr. Bell does not say in his Complaint whether he did as Mr. Vadnais instructed. As a result, the Court does not find it plausible that Mr. Vadnais knew that the condition Mr. Bell complained of was continuing. For this reason, the Motion to Dismiss in regard to Mr. Vadnais is GRANTED.

*Colin Wilson*. Mr. Bell alleges that Mr. Wilson did not respond to a complaint he filed in December 2008. This is the only allegation against Mr. Wilson. As the Court has already noted, receipt of a grievance from a prisoner is not sufficient to establish a prison official's personal involvement in a constitutional deprivation. *See Mateo*, 682 F. Supp. 2d at 430-31. Thus, as to Mr. Wilson, the Motion to Dismiss is also GRANTED.

**IV.**

The final question before the Court is whether the one remaining Defendant, Mr. Luna, should be granted qualified immunity.

> A government official sued in his individual capacity is entitled to qualified immunity (1) if the conduct attributed to him was not prohibited by federal law; or (2) where that conduct was so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time it occurred; or (3) if the defendant's action was objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken.

16

*Munafo v. Metro. Transp. Auth.*, 285 F.3d 201, 210 (2d Cir. 2002) (quotation marks, citations, and alterations omitted). As this test indicates, the question of qualified immunity turns on a government official's conduct. At the motion to dismiss stage, when the Court is required to accept the plaintiff's description of the defendants' conduct as true, qualified immunity can only be granted if the conduct thus described falls as a purely legal matter under one of the three categories above. *See id.*

In this case, the conduct alleged is that for seven months Mr. Luna knew about, and failed to remedy, Mr. Bell's torn, partially unstuffed, inadequate, and unhygienic mattress. Though a more complete factual record is needed, the Court has already concluded that the Constitution prohibits conduct of the kind that has been alleged. Furthermore, in reaching this conclusion, the Court relied upon Second Circuit cases from 1995 and 1996—well before the events at issue in this case. *See Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995); *Campbell v. Meachum*, 1996 U.S. App. LEXIS 29456 (2d Cir. 1996) (summary order).[3] These

---

[3] The Second Circuit has not decided whether an unpublished summary order can serve to "clearly establish" the law for qualified immunity purposes. *See* David R. Cleveland, *Clear As Mud: How the Uncertain Precedential Status of Unpublished Opinions Muddles Qualified Immunity Determinations*, 65 U. Miami L. Rev. 45, 69 (2010). The Second Circuit did recently hold that a summary order that grants qualified immunity cannot bind future panels to grant qualified immunity in similar cases—in part because of the difficulty in determining which cases are similar, given the scant facts provided in most summary orders. *See Jackler v. Byrne*, 658 F.3d 225, 244 (2d Cir. 2011). In the present case, however, *Campbell v. Meachum* is being cited not for the ultimate conclusion—that qualified immunity does or does not obtain—but simply as a statement of established law in the Second Circuit. And while summary orders, as non-precedential opinions, do not make law, they often do state the law. In fact, since summary orders are meant to be used only when the law on a given topic is settled, summary orders presumably provide particularly good evidence of what legal principles the Second Circuit considers as established at any given point in time. *Cf. McCloud v. Testa*, 97 F.3d 1536, 1555 n.28 (6th Cir. 1996) ("[C]itation to unpublished cases, especially in the qualified immunity context, where the key inquiry is whether a principle of law is clearly established, may be perceived as problematic. However, . . . cases the court properly decides not to designate for publication should generally be uncontroversial and establish no new precedent."). The Court notes that *Blissett v. Coughlin*—a case that *is* precedential—

cases stand for the proposition that deprivations of an adequate mattress or bedding can constitute cruel and unusual punishment. Thus, even describing the right at issue in a highly particularized way, *see Nagle v. Marron*, 663 F.3d 100, 114 (2d Cir. 2011), the law of the Second Circuit would have put Mr. Luna on notice in 2008 that failing to provide an inmate with an hygienic, working mattress for over half a year runs afoul of the Eighth Amendment.

"Although a mere mistake in the performance of an official duty may not deprive the officer of qualified immunity, the doctrine does not shield performance that either (a) was in violation of clearly established law, or (b) was plainly incompetent." *Manganiello v. City of New York*, 612 F.3d 149, 165 (2d Cir. 2010). Here, assuming the facts to be as Mr. Bell alleges, Mr. Luna ignored the Warden's determination that Mr. Bell's mattress met the conditions for replacement. He allowed an inmate to sleep on a torn, defective, and unhygienic mattress for nearly seven months, thereby exacerbating several of Mr. Bell's preexisting ailments. And Mr. Luna did this despite repeated requests for help on Mr. Bell's part. If true, this constitutes plain incompetence, and the doctrine of qualified immunity offers Mr. Luna no shield.

The Court emphasizes that this determination is provisional and based solely on the facts alleged in Mr. Bell's Complaint. If discovery shows the condition of Mr. Bell's former mattress to be less dire than Mr. Bell has alleged, the qualified immunity analysis might well change. In fact, discovery might show that no constitutional violation occurred at all. The Court will of course revisit its decision on qualified immunity if, once the factual record has been developed, it turns out to be the case that "officers of reasonable competence could [have] disagree[d] on the legality" of Mr. Luna's delay in replacing Mr. Bell's mattress.

---

provides independent support for the Court's decision to deny qualified immunity to Mr. Luna.

*Manganiello*, 612 F.3d at 165 (quotation marks omitted). For now, however, Mr. Luna's request for qualified immunity is denied.

## V.

To summarize: the Court GRANTS the Defendants' Motion to Dismiss [doc. # 22] as to Defendants Chapdelaine, Murphy, Silvas, Vadnais, and Wilson. **The clerk is instructed to remove these parties from this case.** The Court DENIES the Motion as to Norberto Luna. Mr. Bell's claims for declaratory relief against Mr. Luna in his official capacity and for monetary damages against Mr. Luna in his individual capacity shall proceed.

Discovery in this case was previously stayed pending resolution of Defendants' Motion to Dismiss. *See* Order [doc. # 29]. That stay is now lifted, and discovery shall commence immediately. Discovery shall be completed by July 20, 2012. Dispositive motions in this case shall be filed no later than August 20, 2012.

                      IT IS SO ORDERED.

                       /s/  Mark R. Kravitz
                      United States District Judge

**Dated at New Haven, Connecticut: March 1, 2012.**